IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EQ FINANCIAL, INC., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 05 C 260 |
| PERSONAL FINANCIAL COMPANY, a Delaware corporation, | ) ) ) | Magistrate Judge Mason |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

This matter is before the Court on defendant Personal Financial Company's ("PFC") motion to dismiss with prejudice Count VI and Count VII of EQ Financial Company's ("EQ") fourth amended complaint (the "Complaint"). For the reasons stated below, PFC's motion to dismiss is granted.

**Background**

EQ operated as a lending institution and mortgage wholesaler from 1993 through 2000. (Compl. ¶ 3). During that time, EQ purchased and resold mortgages secured by residential real estate. (*Id.*). Once EQ loaned money pursuant to a mortgage, EQ would promptly sell that mortgage to a third party. (*Id.*). PFC is a finance company in the business of lending both secured and unsecured consumer loans. (Id. ¶ 4).

EQ filed its seven count Complaint against PFC alleging fraud, violations of the Illinois Consumer Fraud Act, fraudulent concealment, negligent misrepresentation, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). See 18

U.S.C. § 1962 *et seq*. Count VI of the Complaint alleges that PFC violated 18 U.S.C. § 1962(c), and Count VII alleges that PFC violated 18 U.S.C. § 1962(d).

EQ alleges that from 1995 through 1997, defendant PFC and non-parties Larry Beeman (a Branch Manager of PFC), David Guel ("Guel"), Honeywood Development Corporation ("Honeywood"), Dollars Express ("Dollars Express"), Grant Mortgage Services ("Grant Mortgage") and Steve Johnson ("Johnson") operated a loan ring (the "Loan Ring"). (Compl. ¶¶ 8-9). EQ alleges that the Loan Ring was a RICO enterprise that engaged in a pattern of racketeering activity and ultimately defrauded EQ of over $1,500,000. (*Id.* ¶¶ 10, 123). According to EQ, the Loan Ring had an identifiable structure with each member fulfilling a specific role to carry out and facilitate its purpose. (*Id.* ¶ 10).

EQ asserts that Guel controlled and operated real estate development companies Dollars Express and Honeywood. (Compl. ¶¶ 11-12). EQ claims that together Guel and Honeywood recruited individuals to invest in "near-worthless" residential real estate on the South and Southeast sides of Chicago as part of a "community redevelopment" project. (*Id.* ¶¶ 11-12, 15). According to EQ, Honeywood promised the investors that they would be "joint venture partners" and together Guel, Honeywood and the investors would renovate distressed properties. (*Id.* ¶ 13). Honeywood and Guel promised to pay the investors a certain amount of money per property at the time of acquiring the property. (*Id.*). Honeywood and Guel also promised to pay the investors $2,500 per property at the end of one year or upon the sale of the rehabilitated property. (*Id.*). In exchange for the investors' credit, Honeywood promised to handle all financing matters, make payments on the loans secured by the property and use the loan proceeds to renovate the property. (*Id.*). EQ alleges that the "community redevelopment" program was really a complex fraud

designed to obtain loan proceeds and that few, if any, of the properties were ever rehabilitated. (*Id.* ¶ 14).

EQ alleges that the Loan Ring operated as follows: after Guel and Honeywood recruited investors and selected investment properties, John J. Hasler,[1] a real estate appraiser, prepared property appraisal reports in both the "as-is" condition of the properties and in the "rehabilitated" condition of the properties. (Compl. ¶ 17). Then, Guel and Dollars Express prepared and tendered sworn contractor's statements to Hasler identifying the items that needed to be repaired and the costs for repairing such items in order to get the properties to the "rehabilitated values." (*Id.* ¶ 18). Upon receipt of the appraisals performed by Hasler and the contractor's statements, PFC issued mortgage loans (the "PFC Loans") to the investors in an amount up to 75% of the "rehabilitated values" of the properties. (*Id.* ¶ 19).

While not entirely clear from the Complaint, apparently, between May through December of 1996, the Loan Ring brought new investors to EQ to obtain new loans on the same properties, and the PFC Loans were paid off. EQ alleges that in 1995 and 1996, a mortgage broker,[2] Grant Mortgage, presented EQ with loan packages (the "Loan Packages"). (Compl. ¶¶ 38-40, 49; Exhibit B). The Loan Packages contained loan applications, payoff letters from PFC stating the existing balance due on the PFC loans (the "Payoff Letters"),[3] property appraisal reports completed by Johnson, the investors' credit

---

[1] Hasler is not alleged to be a member of the Loan Ring.

[2] A mortgage broker is an individual or company that acts as an intermediary between borrowers and lenders.

[3] The earliest Payoff Letter is dated April 29,1996, and the last Payoff Letter is dated December 2,1996.

3

reports and submission sheets verifying the reasons for the loans. (*Id.* ¶¶ 40, 42). Based upon the information contained in the Loan Packages, EQ issued new loans on the properties (the "Subject Loans") from May through December of 1996. (*Id.* ¶¶ 38, 40, 45, 48-49).

EQ alleges that the Payoff Letters contained in the Loan Packages inflated the actual balance due on the existing PFC mortgage. (Compl. ¶¶ 33-35). Essentially, EQ asserts that the amount listed on each Payoff Letter was more than the amount required to clear PFC's lien on the properties because PFC: (1) did not properly disburse funds set aside for construction; (2) improperly disbursed loan proceeds; (3) improperly calculated and charged interest on the Subject Loans; (4) improperly disbursed funds to itself for interest payments on the Subject Loans; (5) improperly calculated the payoff amount as that of principal and interest plus undisbursed construction escrow funds; and (6) improperly increased the principal amount due on the Subject Loans. (*Id.* ¶¶ 27-30, 33-35). In addition, EQ alleges that PFC disbursed money to Honeywood for unknown or undocumented reasons; charged interest on improperly disbursed funds; and failed to disburse payments for construction work that did occur. (*Id.* ¶¶ 25, 27-28, 30, 33-35, 43-44). As a result, EQ alleges that it ended up paying more than it should have for the Subject Loans. (*Id.* ¶¶ 43, 48).

When EQ received the Loan Packages from Grant Mortgage, EQ claims that its employees reviewed the documents and relied on the Payoff Letters when determining whether to issue the Subject Loans. (*Id.* ¶ 47-48). EQ claims that it would have refused to issue the Subject Loans if the Payoff Letters honestly stated the actual amounts necessary to clear PFC's lien on the properties, the amounts improperly disbursed to Honeywood and

4

Guel, and that the funds initially set aside for construction work were never completely disbursed. (*Id.* ¶¶ 43, 48).

After EQ issued the Subject Loans, it sold them to Green Tree under the terms of an agreement entered into by EQ and Green Tree on August 19, 1996. (Compl. ¶ 54). Honeywood and the investors subsequently defaulted on the Subject Loans in December of 1997. On February 26, 1998, Green Tree filed an arbitration proceeding against EQ alleging that EQ had acted in violation of an agreement between EQ and Green Tree when EQ sold the loans to Green Tree. (*Id.* ¶ 55). Green Tree also alleged that EQ was a participant in a fraudulent scheme. (*Id.*). On December 28, 2000, an arbitration award was entered finding that EQ had not been a participant in a fraudulent scheme but that EQ was liable to Green Tree under the terms of the agreement between the two parties in the amount of $4,108,919.98. (*Id.* ¶ 57). Thereafter, a judgment was entered by the United States District Court for the Northern District of Illinois in favor of Green Tree and against EQ in the amount of $4,269,470.40 plus post-judgment interest. (*Id.*). EQ alleges that as a result of its reliance on the Payoff Letters, EQ has suffered losses including: (1) the amount of the judgment; (2) attorneys' fees and costs for the arbitration; and (3) EQ has been forced out of business. (Compl. ¶ 59). EQ asserts that PFC is responsible for the resulting losses. (*Id.* ¶ 129).

This case originated in Circuit Court Cook County, case number 02 L 013543, in 2002. On December 22, 2004, EQ served PFC with the third amended complaint.[4] On January 14, 2005, PFC removed the case to the U.S. District Court for the Northern District

---

[4] EQ filed the third amended complaint on December 17, 2004.

of Illinois. Ten days later, PFC filed a motion to dismiss EQ's third amended complaint. On March 14, 2005, while PFC's motion to dismiss was still pending, EQ was granted leave to file the fourth amended complaint. The parties consented to the jurisdiction of a U.S. Magistrate Judge on May 19, 2005. On June 7, 2005, this Court denied PFC's Motion to Dismiss the Third Amended Complaint as moot. On June 29, 2005, PFC filed its Motion to Dismiss the Fourth Amended Complaint (the "Motion"). The next day, EQ filed a Motion to Strike Portions of the Motion to Dismiss the Fourth Amended Complaint. On July 18, 2005, we granted EQ's Motion to Strike Portions of the Motion to Dismiss as the motion to dismiss related to Counts I-V of the Complaint. Accordingly, the remaining issue before this court is whether to dismiss Counts VI and VII of the Complaint.

**Analysis**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999).

Federal Rule of Civil Procedure 9(b) applies to fraud-based RICO claims. *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 726 (7th Cir. 1998). To plead a fraud-based RICO claim with particularity a plaintiff must, at a minimum: 1) "describe the predicate acts [of

6

fraud] with some specificity," 2) state the time, place, and content of the alleged fraudulent communications, 3) and notify each defendant of his or her role in the alleged scheme. *Id.* This heightened pleading requirement is designed "to force plaintiff to do more than the usual investigation before filing [the] complaint." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). Rule 9(b) "serves three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994).

PFC argues that Count VI of the complaint should be dismissed with prejudice because the complaint does not allege: (1) the existence of a RICO enterprise; (2) that PFC managed or directed the RICO enterprise's affairs; or (3) a pattern of racketeering activity. PFC also argues that Count VII of the Complaint should be dismissed with prejudice because EQ has failed to establish a claim under 18 U.S.C. § 1962(c). For the following reasons, we grant the Motion without prejudice.

**EQ's RICO Claims**

EQ brought Count VI under 18 U.S.C. § 1962(c) based on claims of the alleged mortgage fraud scheme involving mortgage loans originated by the Loan Ring. EQ alleges that the scheme was devised, operated and managed as an enterprise for the purpose of racketeering activity. RICO Section 1962(c) provides:

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

According to the Supreme Court, this portion of the statute means that "[t]he elements

7

predominant in a subsection (c) violation are: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52 (1997). (citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).

EQ brought Count VII under 18 U.S.C. § 1962(d) which provides:

[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a),(b), or (c) of this section.

**I. EQ failed to allege a RICO enterprise**

When pleading a RICO claim, the plaintiff must identify the RICO enterprise. *Jennings v. Emry*, 910 F.2d 1434, 1439-40 (7th Cir. 1990) (quotation omitted). Under the RICO statute, an enterprise can be made up of "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The "hallmark of an enterprise is structure." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995). To establish structure, the plaintiff must show that the association is "joined in purpose and organized in a manner amenable to hierarchical or consensual decision-making." *Jennings*, 910 F.2d at 1440.

EQ asserts that the Loan Ring was a RICO enterprise and that the Loan Ring was comprised of individuals and entities including defendant PFC and non-parties Beeman, Guel, Honeywood, Dollars Express, Grant Mortgage and Johnson. The Complaint outlines the roles that Honeywood, Guel, Grant Mortgage, Dollars Express, Johnson and PFC allegedly assumed as Loan Ring members. However, the Complaint fails to identify the structure and organization of the alleged enterprise. For example, there are no allegations explaining how the Loan Ring originated. There are also no allegations reflecting how, if

8

at all, the Loan Ring members communicated with one another. Moreover, the Complaint lacks any factual allegations identifying how the Loan Ring's organization was amenable to hierarchical or consensual decision-making. As a result, EQ has failed to allege the existence of a RICO enterprise within the meaning of the RICO statute. Therefore, EQ's Complaint fails to state a claim against PFC under § 1962(c). In light of the fact that the parties address other aspects of the Complaint, we will address the multiple other deficiencies that exist in Count VI.

## II. EQ failed to allege that PFC managed or directed a RICO enterprise

Even if EQ adequately identified a RICO enterprise, the Complaint fails to allege that the "person" (PFC) associated with the enterprise conducted or participated, "directly or indirectly, in the conduct of such enterprises's affairs through a pattern of racketeering activity." See 18 U.S.C. § 1962(c). Under §1962(c), liability for participating in the conduct of the enterprise through a pattern of racketeering extends to those who "play some part in directing the enterprises's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Liability may also extend to lower-level participants who play some material role under the direction of upper management. *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, Inc*.,* 62 F.3d 967, 978-79 (7th Cir. 1995).

The Complaint contains numerous allegations that PFC paid itself and Honeywood out of loan proceeds and sent inaccurate Payoff Letters. (Compl. ¶¶ 28, 33-37, 43-44, 48). The Complaint also alleges that PFC's racketeering activity was its regular method of conducting and influencing the conduct of the Loan Ring. (Compl. ¶ 127). However, the Complaint contains no factual allegations identifying who was the head of the Loan Ring; who made decisions for the Loan Ring; who directed the RICO activity; how PFC managed

9

or directed the operation of the Loan Ring; how PFC decided what course of conduct the Loan Ring was to take; or if PFC took direction from other members of the Loan Ring. Furthermore, there are no allegations explaining how PFC determined how much money to pay itself and Honeywood, or how PFC determined the appropriate time to make such disbursements. As previously stated, RICO allegations must be pled with particularity under Rule 9(b). The Complaint falls short of alleging exactly how PFC managed the Loan Ring or exercised control over the Loan Ring, nor does the Complaint allege that PFC acted pursuant to the direction of upper management. Therefore, EQ failed to plead sufficient facts that would demonstrate that PFC participated in the conduct of the Loan Ring. Accordingly, dismissal is appropriate.

**III. EQ failed to allege a pattern of racketeering**

EQ has alleged that PFC engaged in mail and wire fraud from 1995 through 1997. (Compl. ¶121). Violations of the federal mail and wire fraud statutes, qualify as predicate acts of racketeering under 18 U.S.C. § 1961(1). However, to adequately allege a pattern of racketeering activity, a party's allegations are tested against Rule 9(b) and the jurisprudence which has developed standards for pleading a RICO pattern.

To establish a pattern of racketeering, plaintiff must allege two predicate acts of racketeering and must also meet the "continuity plus relationship" test which requires that "the predicate acts must be related to one another (the relationship prong) and pose a threat of continued activity (the continuity prong)." *Midwest Grinding v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992) (citing *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)). The relationship prong of the test requires that the predicate acts be "committed somewhat

closely in time to one another, involve the same victim, or involve the same type of misconduct." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). The parties do not dispute whether EQ has satisfied the relationship prong as set forth by the *Midwest* court. Therefore, we only address the continuity prong.

Continuity is "both a closed-ended and open-ended concept." *Midwest*, 976 F.2d at 1022 (quoting *H.J., Inc.*, 492 U.S. at 241). EQ argues in its Response brief that the Loan Ring engaged in a closed-ended period of racketeering. (Resp. p. 6). A closed-ended period of racketeering involves a course of conduct that has terminated. *Midwest*, 976 F.2d at 1022. In order to demonstrate a pattern over a closed period, a RICO plaintiff must "prove a series of related predicates extending over a substantial period of time." *H.J., Inc.*, 492 U.S. at 242. In *Morgan v. Bank of Waukegan*, the Seventh Circuit outlined a multifactor continuity test for determining whether a closed-ended pattern of racketeering has been established. 804 F.2d 970, 975 (7th Cir. 1986*)*. Continuity is a function of: (1) the duration of the predicate acts, (2) the number and variety of predicate acts, (3) the number of victims, (4) the presence of separate schemes, and (5) the infliction of distinct injuries. *Morgan*, 804 F.2d at 975. *See also Wade v. Hopper*, 993 F.2d 1246, 1251 (7th Cir. 1993).

### A. Rule 9(b) analysis

The starting point for pleading fraud claims under RICO is Rule 9(b) which requires all averments of fraud to be stated with particularity. *Graue Mill Dev. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir. 1991). Parties pleading RICO fraud must state the time, place and content of the alleged communications perpetrating the fraud. *Id.* To state it another way, plaintiffs are required "to plead in detail the 'who, what, when, where, and

11

how' of the circumstances constituting the fraud." *Cumis Ins. Soc'y, Inc. v. Peters*, 983 F. Supp. 787, 792 (N.D. Ill. 1997) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). For purposes of this opinion, we break up the alleged scheme into three time periods: (1) acts occurring from January of 1995 through March of 1996 (the "Beginning Stage"); (2) acts occurring from April of 1996 through December of 1996 (the "Middle Stage"); and (3) acts occurring in December of 1997 (the "Final Stage"). We discuss each stage in turn.

### 1. The Beginning Stage of the scheme

In the Complaint, EQ alleges that in the Beginning Stage, the Loan Ring engaged in "[n]umerous uses of the United States Mail and interstate wires ..." (Compl. ¶¶ 9, 16). EQ then cites to Exhibit A of the Complaint. Exhibit A identifies mail and wire communications made by PFC and other Loan Ring members during all three stages of the scheme in 1995, 1996 and 1997. For the most part, Exhibit A identifies the approximate dates that the mail and wire communications occurred (some communications are undated); the purported senders and recipients (when available); some investors; and the subject properties involved in the communication.[5] However, EQ does not connect the mail and wire communications contained in Exhibit A with the factual allegations regarding the Beginning Stage of the scheme contained in the Complaint. Moreover, EQ failed to allege the content of the communications made during the Beginning Stage of the scheme. The Court will not make assumptions about how the communications contained in Exhibit A

---

[5]Exhibit A also identifies two "Miscelaneous [sic] RICO Events." One of the two events vaguely describes radio advertisement broadcasts occurring in at "varrious [sic] times." Because these wire communications are undated, do not identify the sender or the recipients and do not adequately allege content, the radio broadcasts fail to meet Rule 9(b) standards.

12

related to the Beginning Stage. Therefore, EQ failed to allege the predicate acts occurring in the Beginning Stage with the particularity required under Rule 9(b).

### 2. The Middle Stage of the scheme

PFC does not dispute that the Payoff Letters mailed during the Middle Stage constitute predicate acts.[6] However, the additional predicate acts of mail and wire fraud that occurred during the Middle Stage of the scheme and identified in Exhibit A also fail to meet Rule 9(b) standards under the same reasoning discussed in the Beginning Stage section of this opinion.

### 3. The Final Stage of the scheme

EQ issued and subsequently sold the Subject Loans to Green Tree in 1996. EQ alleges that the Final Stage of the scheme occurred in December of 1997 when Honeywood stopped making installment payments on the Subject Loans and sent letters to the investors advising the investors that Honeywood had been sold to a company named Chicago Rehab (the "Honeywood Letters").

Again, EQ has not alleged the activities that occurred during the Final Stage of the scheme with particularity under Rule 9(b). The Complaint contains no information whatsoever regarding: (1) how the installment payments were made by Honeywood (wire or mail); (2) when the installment payments were made; or (3) who or what entity received the payments. Therefore, the installment payments were not alleged with particularity under Rule 9(b).

---

[6]We note that after comparing the Payoff Letters (Exhibit C of the Complaint) and the EQ loan amounts (Exhibit B of the Complaint), several of the Payoff Letters either do not match the date the EQ issued the Subject Loan or the Payoff Letters are missing altogether.

Although the Complaint and Exhibit A explain that Honeywood sent the Honeywood Letters, a brief summary of the content of the Honeywood Letters and when the letters were sent, neither the Complaint nor Exhibit A identify the recipients of the Honeywood Letters. Therefore, EQ has failed to allege the Honeywood Letters with particularity required under Rule 9(b).

Moreover, we question whether other grounds exist which would require us to eliminate the activities occurring during the Final Stage of the scheme from the Loan Ring's pattern of racketeering. The Final Stage of the fraudulent scheme is alleged entirely in paragraph 51 of the Complaint. The Complaint itself frames the activities occurring in the Final Stage as efforts to conceal the Loan Ring's activities. In fact, the Complaint plainly states that the "Loan Ring attempt[ed] to conceal itself and its fraud." (Compl. ¶ 51). However, if the alleged scheme has already reached fruition at the time the alleged activities occurred, then such activities may not be considered for purposes of the pattern analysis. *See McDonald v. Schencker*, 18 F.3d 491, 496 (7th Cir. 1994); *Midwest Grinding*, 976 F.2d at 1024. The scheme to defraud EQ ended in 1996 when EQ issued and then sold the Subject Loans to Green Tree. Therefore, it appears that the Honeywood Letters would have only served to conceal the Loan Ring's fraud, not further it.

### B. The *Morgan* Factors

After the 9(b) analysis, the only predicate acts that EQ adequately alleged are the Payoff Letters. PFC sent the Payoff Letters from April of 1996 through December of 1996, a period of eight months.

The Seventh Circuit has held that duration is "the closest thing we have to a bright-line continuity test: the predicate acts must extend over a substantial period of time; a few

14

weeks or months is considered insubstantial." *Midwest*, 976 F.2d at 1024 (quoting *H.J., Inc.*, 492 U.S. at 242) (internal quotations omitted).  The *Midwest* court provided an expansive list of cases finding a duration of less than two years insufficient to establish continuity under a closed-ended analysis. *Midwest*, 976 F.2d at 1024 (citing *J.D. Marshall Int'l., Inc. v. Redstart, Inc.*, 935 F.2d 815, 819 (7th Cir. 1991) (thirteen months); *U.S. Textiles, Inc. v. Anheuser-Busch Co., Inc.*, 911 F.2d 1261, 1266 (7th Cir. 1990) (sixteen months); *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990) (eighteen months); *New Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1478 (7th Cir. 1990) (several years). Thus, a duration of eight months is insufficient to establish continuity under a closed-ended analysis and dismissal is warranted.

Even if an eight month duration were sufficient to establish continuity, we question EQ's ability to satisfy the remaining Morgan factors: (1) number and variety of predicate acts; (2) number of alleged schemes; (3) number of victims; and (4) distinct injuries.

In its Response brief, EQ argues that at least 160 predicate acts are attributable to PFC.  Although the sheer number of predicate acts might appear at first glance to prove continuity, when it comes to a pattern premised on acts of mail or wire fraud, the volume of mailings is not dispositive. *See U.S. Textiles*, 911 F.2d at 1266.  In addition, the Complaint is based only upon acts of mail and wire fraud.  However, the Seventh Circuit takes a dim view of RICO claims based only on mail and wire fraud. *See Vicom* 20 F.3d at 781.  Thus, this *Morgan* factor weighs against EQ.

With respect to the number of alleged schemes, courts can no longer conclude that the pattern requirement has not been satisfied solely on the basis that the plaintiff alleged only one scheme. *H.J., Inc.*, 492 U.S. at 235.  However, the Seventh Circuit has held that

15

the number of schemes is still relevant to whether continuity exists. *See Vicom*, 20 F.3d at 781-82. EQ concedes that it only alleged one scheme in the Complaint. (Resp. p. 12). Thus, this *Morgan* factor weighs against EQ.

In its Response brief, EQ argues that there were 31 separate victims of the Loan Ring scheme to defraud: EQ, Green Tree and 29 investors. (Resp. p. 6). As to the number of victims, the Complaint falls short of alleging how the investors were victims of the scheme. It is possible for the Court to speculate how the investors were injured by the conduct of PFC and the Loan Ring, but again, Rule 9(b) requires EQ to allege such information with particularity. With respect to Green Tree, Green Tree's injuries could just as easily be attributed to EQ because EQ sold the Subject Loans to Green Tree. At best, EQ has alleged a single scheme to defraud one victim, EQ. Thus, this *Morgan* factor also weighs against EQ.

Finally, the last *Morgan* factor is whether a RICO plaintiff has alleged non-distinct injuries. We question whether EQ's economic injuries are really distinct injuries for purposes of the continuity analysis under Morgan. EQ claims that it: (1) has become indebted to Green Tree in the amount of the judgment $4,269,470.40 (plus post-judgment interest); (2) has incurred attorneys' fees and costs for the Green Tree arbitration in an amount in excess of $800,000; and (3) has been forced out of business. Courts view economic injuries based on a single scheme to defraud as non-distinct. *See Vicom*, 20 F.3d at 782 (no distinct injuries when plaintiff incurred multiple economic losses stemming from similar predicate acts as part of a single scheme); *Meyer Material Co. v. Mooshol*, 188 F.Supp.2d 936, 943 (N.D. Ill. 2002) (no distinct injuries when the defendant repeatedly embezzled from the plaintiff using similar predicate acts as part of a single scheme).

Similarly, EQ's alleged injuries appear to be multiple, non-distinct economic losses that EQ incurred from issuing the Subject Loans. EQ's economic injuries are cumulative and stem from similar predicate acts and one scheme to defraud. Thus, this *Morgan* factor also weighs against EQ.

We conclude that EQ has not adequately alleged a pattern of racketeering under Rule 9(b). Furthermore, EQ has failed to allege a closed-ended pattern of racketeering which satisfies the continuity prong of the pattern requirement.

In sum, EQ has failed to adequately allege the RICO enterprise, PFC's participation in the conduct of the enterprise, or a pattern of racketeering activity. Accordingly, Count VI is dismissed.

**Section 1962(d) claims**

Because EQ has failed to establish a violation of section 1962(c), EQ's section 1962(d) claim based on the same facts must also fail. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000) (relying on *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1026 (7th Cir. 1992). Therefore, Count VII is dismissed.

**Conclusion**

For the reasons set forth above, PFC's motion to dismiss is granted. Counts VI and VII are dismissed without prejudice. If EQ believes that it can reformulate Counts VI and VII to comport with this opinion, which we doubt, EQ may present a proposed fifth amended complaint and move for leave to file it within thirty days. It is so ordered.

ENTER:

_____

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated:     March 23, 2006**